## Quarterman et al. v. Arnold.

(Decided May 31, 1932.)

HICKMAN & WITHERS, LAWRENCE S. LEOPOLD and FRANK E. DAUGHERTY for appellants.

WALTER P. LINCOLN and WILLIAM S. HEIDENBERG for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER— Affirming.

Carl R. Arnold owns a lot on the west side of Southern Parkway between Ashland and Woodlawn Avenues in Louisville. The lot, 50 feet in width, extends from the boulevard 275 feet to an alley, and is improved with a stone residence and a garage. To the

north and between the Arnold property and Ashland Avenue and in the order named are the lots ·of Mrs. Helen Quarterman, D. Y. Stamp, Robert E. Tafel, and Mr. Short, and immediately to the south is the lot of Mrs. L. D. Clark. As we gather from the record, all the lots are of the same dimensions as that of Mr. Arnold.

Prior to the year 1929, the Davis Construction Company was engaged in construction work in the vicinity of these lots, and was permitted to keep its machinery upon the lots of Mrs. Quarterman and Mr. Stamp under an agreement to use surplus dirt from the construction work to fill these lots. About the latter part of June of that year, the construction company did begin to fill these lots and continued until August 8, when Mr. Arnold instituted this action in the Jefferson circuit court against Mrs. Quarterman and Mr. Stamp. At the time the action was instituted, 500 loads or approximately 2,000 cubic feet of dirt had been placed on the lots, and, under the agreement with the owners, the construction company was to place 120 loads or approximately 480 cubic yards more thereon.

By the petition as later amended it is, in substance, alleged that the lots owned by defendants are naturally lower than the lot of plaintiff, but that, by reason of the filling of their lots, they have raised the surface from one to three feet higher, thereby changing the natural course of the flow of surface water falling and accumulating thereon and so diverting the natural and customary course as to cause same to flow on and over his lot; that, since the fill has been made, water falling on these lots is caused to accumulate and overflow plaintiff's lot with quicker and greater flow, thereby rendering · insufficient and useless for the protection of his property the drain sewer maintained thereon which prior to the filling complained of had been adequate to and .did protect same from overflow and water damage.

By joint and separate answer, defendants made a general denial of the allegations of the petition and by second paragraph admitted that they were filling portions of their lots, but that prior to and at the time they acquired their lots and before any fill was made, the natural flow of the surface water from lands north of plaintiff including their lots was from north to south on and across the lot of plaintiff; that the filling they had done had not and would not cause any greater amount of surface water to flow from their lands to

land of plaintiff than would naturally flow thereon at and prior to the time they acquired the lots; that, at the time the injunction issued, they were causing dirt to be placed upon their lots with the intention of grading them to the level of the land immediately north, and that, upon completion of the grading undertaken, their lots would be on a level with lots to the north with a slope toward the east; that a considerable less amount of surface water would then flow upon plaintiff's lot than did before any grading was done.

By reply and by order controverting of record the allegations of the amended petition, the issues were completed. After hearing the evidence introduced by the respective parties which goes to make up over 350 pages of the record, judgment was entered granting to plaintiff the relief sought and directing that defendants immediately adopt and carry out measures to furnish and maintain either sewer, drain, ditch, or retaining wall reasonably sufficient to carry away surface water accumulating on their lots into the public sewers adjacent thereto and to prevent same from flooding plaintiff's lot. Defendants have appealed.

While brief for appellants discusses the law as to surface water and as to the weight to be given the chancellor's opinion on appeal, a careful reading of the brief discloses that the only ground relied on for reversal is that the evidence is not sufficient to warrant or sustain the chancellor's finding.

It appears from the evidence that appellee purchased his lot in March, 1929, and he testified that between the time he purchased the lot and the time the filling was done on lots of appellants there were a number of unusually hard rains, but that no water accumulated on his lot; that, after the filling had been done and before he filed suit, his lot was overflowed every time there was a rain of any considerable duration. The first rain after the filling was done caused water to stand two and one-half feet in depth on his lot, and the heaviest overflows caused his basement to fill with water and every rain of six or seven hours' duration would cause water to collect and stand in his back yard. He also testified that there was a depression in the lots of defendants where surface water collected and formed a considerable pond. Mr. Shriver, an employee of the Davis Construction Company who did the filling on appellants' lots, testified that there was a de-

pression in which he placed dirt to a depth of three or four feet. He also testified that water collected and stood in this depression. Mr. Tafel, who owns a lot north of the Stamp lot, also testified as to this depression, stating that prior to the time the fill was made a pond formed on these lots which extended over on his lot, but that he filled the depression on his lot. According to his evidence, this depression in which water collected and formed a pond extended the entire width of the Stamp lot and partially across the Quarterman lot. He also testified that, after the fill was made on appellants' lots, it caused the surface water to divide, part to overflow and stand on his lot while the remainder flooded the lot of appellee. He stated that he had observed the water both before and after the fill was made, and his evidence tends to indicate that the fill of appellants' lots has greatly increased the flow of water onto the lot of appellee. W. T. Baker, who formerly owned the Tafel lot, and Edward J. Schwartz, who built and for four years lived in the house now owned by Mrs. Clark, testified that the flow of the surface water on appellants' lots was from the rear toward the front where it collected and stood although the former stated that there was a slight flow to the south. Mrs. Clark, who lives immediately south of appellee, testified that prior to the filling of appellants' lots she never noticed water standing on Mr. Arnold's property, and that she had no trouble from water from that side of her lot, but, since the fill had been made, it looked just like a lake after every heavy rain, the water standing about two feet on his garage and extending over to her yard. A number of photographic views of various portions of the lots in controversy were introduced in evidence to show the character of the filling that had been done and how the grade of appellants' lots had been changed with reference to adjoining property.

Mrs. Quarterman testified that she had been engaged in the real estate business and buying and selling property for herself and others for a number of years and had bought and sold property in the vicinity of her lot; that the natural flow of water on the block where her lot was situated was from Ashland avenue to the south, and that her lot and the Stamp lot were higher than Arnold's lot. She testified positively that there was no depression on appellant's lots in which water accumulated or stood. Her evidence is to the effect that there was a depression extending over all the lots in

this block from which surface water flowed from the north to the south, and during rains water would collect in this depression, but would immediately flow away to the south. She stated that she examined the Arnold property before the fills complained of were made with the view of buying it for Mr. Stamp but found water standing in the yard and in back of the house to such an extent that she could not get off the step to examine the basement. She declined to buy the property on account of this condition. Mrs. Akers, a sister of Mr. Stamp, who acted as agent in looking after his property during his long illness, also testified that she examined the Arnold property with a view of buying it for her brother, and she saw water standing in the basement a number of times. She also declined to buy on account of that condition. Mr. Stamp testified that he had been engaged in the real estate and building and construction business for a number of years, and estimated that he had built 400 houses in this section of the city. He stated, although due to ill health, he had not been out for three years, he was familiar with the block on which his lot was situated and that the natural drainage over the lots in the block was to the south; his lot and the Quarterman lot being higher than the Arnold property. He purchased the Clark and Arnold lots for the purpose of building a home, paying $25 a foot for them. Finding them too low, he then purchased the lot to the north for $50 a foot, making that difference on account of the difference in elevation. He testified that no water had stood on his lot or the Quarterman lot previous to the time other lots had been filled, but that the filling of the lots to the south had retarded the flow of the water in the depression extending across the entire block. Mrs. Annie Lancaster, who lived in the community and who bought and sold property, testified that the Arnold house remained vacant because water stood in the basement; that she looked at the property for the purpose of buying it, but did not on account of that fact. W. H. Smallwood, a building engineer, testified that he built the Arnold house and when he went there the whole district was dry, but about the 1st of November, rain set in and all the water seemed to collect on that lot. Drains were cut to drain the water off. He gave as his opinion that the grades of the Quarterman and Stamp lots did not make any change in the flow of the water. J. D. Neubauer, Oscar D. Lancaster, Geo. W. Frantz, Charles A.

Parker, Charles Ward, a park policeman, John C. Spoo, who built the house on the Tafel lot, B. L. Baker, the real estate agent who sold the lot to Mr. Stamp, and Herman Reike, all of whom had lived in or were well acquainted with the community, testified that the natural flow of water was from Ashland avenue to the south. A number of them testified that they never knew of water standing on the Stamp or Quarterman lots. There was also considerable evidence that the land in controversy is inclined to be wet and marshy and that many of the home owners are troubled with water in their basements. Henry E. Read, a civil engineer living at 2542 Southern Parkway, testified that he had known the property in question for a number of years and had taken some levels, finding that the center line of the Arnold lot where it intersects the alley is eight feet higher than the center of the alley back of the Arnold property, and that the catch-basin to the sewer on the Arnold lot is two feet ten inches lower than the alley; that the fall of the sewer from the lot to the alley sewer is about one foot six inches, and the water cannot flow into the Arnold sewer unless the water in the alley sewer drops below three-fourths full. He gave as his opinion that water backed up to the basement of the Arnold house through the sewer.

In rebuttal, Mr. Arnold testified that the water did not come into the basement through the sewer, but ran into the basement at the door, and that he never had any water in his basement until the filling complained of was made. Warren H. Long, a real estate agent who sold the property to Mr. Arnold, testified that he had been in the house a number of times and was there with Mr. Arnold during a heavy rain and a rainy week, and that there was no water standing on the lot or in the basement and no sign of water having stood in the basement or the garage. Leslie V. Abbott, architect and civil engineer, testified that he was familiar with the neighborhood, and gave evidence as to certain levels taken by him, and filed a sketch showing general drainage conditions, but he could only testify as to conditions he found after the lots had been filled, as he was not familiar with the natural lay of the lots. His evidence, however, tends to indicate that the filling had been made in such a way as to concentrate the water on the Stamp and Quarterman lots and cause it to flow onto the Arnold lot just opposite the residence, a condition

which could have been corrected at a cost of less than $50.

From the foregoing recital of the evidence introduced to sustain the respective positions of the parties, it is apparent that there is much evidence indicating the correctness of the chancellor's finding, while, on the other hand, there is much evidence pointing the other way. We find it stated in brief of counsel for appellee that, after the evidence had been heard and the case argued, counsel met to consider the form of decree to be entered, and, at the suggestion of appellants, the chancellor went upon the lots in question while it was raining.

Authorities cited by counsel for appellants are to the effect that, as between owners of higher and lower ground, the owner of the upper has easement to have the water flow in its natural way from his land onto the lands of the lower owner, and that the lower owner has no right to obstruct its natural flow or to cast it back upon the lands of the upper proprietor, and also authorities to the effect that mere acceleration of the flow does not constitute actionable injury. No authorities are cited to the effect that the relief granted in this instance is not authorized where, by the filling, grading, or use of his property, an owner may divert the natural flow of water or cause it to flow in increased volume or quantity on or over the lands of another. In other words, it seems to be conceded that proven facts and conditions may be such as to justify injunctive relief. Thus the real question presented for determination as indicated at the outset is whether the proven facts and circumstances of this case are such as would indicate the propriety of the relief granted.

On appeal of an equitable action, the chancellor's finding of fact is not treated as the verdict of a properly instructed jury; yet it has been consistently held by this court that such finding is entitled to weight, and, if upon a consideration of all the evidence, this court is left in doubt as to whether the judgment is supported by the evidence, it should not be disturbed. Combs v. Casebolt, 233 Ky. 192, 25 S. W. (2d) 365; Green v. Hammons, 232 Ky. 59, 22 S. W. (2d) 422; Hagan v. Hurst, 228 Ky. 645, 15 S. W. (2d) 446; Hollingsworth v. Avey, 182 Ky. 334, 206 S. W. 493.

There is evidence that surface waters from appellants' lots collected and stood in a depression thereon

prior to the time the filling was done, whereas it now flows onto and stands in appellee's lot and in his basement. There is, however, much evidence that the natural drainage flow has always been over lots of appellants to that of appellee, and that water did not stand on appellants' lots prior to the filling complained of. It may be said that numerically the evidence preponderates to the theory that the natural flow is from north to south over the lots in question. In the sharp conflict of evidence with the theory of each side finding substantial support and wholly apart from statement in brief that chancellor viewed the premises during a rain, the mind is left in such doubt as forbids a disturbance of the chancellor's finding.

Judgment affirmed.